## Application of ST. JOSEPH TEL. & TEL. CO.
### No. 6395-TP.

Railroad & Public Utilities Commission.

April 2, 1962.

---

Robert M. Avent, Jacksonville, for the applicant.

Lt. James B. Archer, Communications Officer, Tyndall Air Force Base, and Captain W. C. Bain, 73rd Air Division, Tyndall Air Force Base, for the Air Force.

Bourke Floyd, Apalachicola, for the City of Apalachicola.

Virgil Mayo, Chattahoochee, for the Town Council of the Town of Chattahoochee.

Dan W. D'Alemberte, Chattahoochee, for a civic club of Chattahoochee.

Marion B. Knight, City Attorney, Blountstown, for the City of Blountstown, protestant.

Lewis W. Petteway, General Counsel and James L. Graham, Jr., Assistant General Counsel, for the commission staff and the public generally.

Chairman WILBUR C. KING, Commissioners JERRY W. CARTER and EDWIN L. MASON participated in the disposition of this matter.

BY THE COMMISSION.

Pursuant to order #3202, previously entered in this docket, public hearings were held with regard to the subject application on September 6, 1961, in the city hall of the city of Port St. Joe, and on October 17, 1961, at the same place.

Pursuant to the request of certain parties opposing the rate increase sought by the petitioner, the commission by order #3232 set this matter down for further hearing on October 18, 1961, and held such further hearing in the Calhoun County Courthouse in Blountstown.

The commission having considered the entire record with regard to this matter now enters its order in the premises.

The St. Joseph Telephone and Telegraph Company is a corporation organized and existing under the laws of the state of Florida with its principal office and place of business in the city of Port St. Joe, Gulf County, Florida. The company is engaged, in addition to other activities, in the general telephone business and maintains exchanges in the cities of Altha, Apalachicola, Port St. Joe, Carrabelle, Blountstown, Chattahoochee, Wewahitchka, Bristol, and Tyndall Air Force Base. It also maintains an exchange in an unincorporated area along the gulf beaches in Gulf and Bay counties. The company serves the rural areas adjacent to these

exchanges, and also transmits and receives long distance toll calls in intrastate and interstate commerce. In addition to the above services, the company also owns and operates communication facilities used, in conjunction with other facilities provided by other companies, by the United States Government in providing a communication network known as semi-automatic ground environment, commonly known as SAGE.

As a part of its program of modernization and expansion of its plant facilities, the company has converted all of its manually operated exchanges to automatic dial exchanges and continues to extend its lines into rural areas, making telephone service available to subscribers who could not formerly obtain it. To provide such expansion, the company during the past several years has expended, from its own funds and from funds borrowed from the Rural Electrification Administration, in excess of $2,600,000.

The company points out in its petition that its presently authorized rates for local service vary considerably between its various exchanges. Not only were some of the rates established prior to the installation of modern exchange equipment which replaced outmoded equipment but, in addition, the number of subscribers served by some exchanges has increased substantially. The company feels, therefore, that the difference in rates is unjustified and inequitable from its own point of view as well as from the point of view of certain of its customers.

In order to establish more uniform rates between its exchanges and provide the additional revenue which the company maintains it is entitled to receive, it has proposed increases in rates in virtually all of its exchanges which would provide on an annual basis an increase in total revenues amounting to some $44,194.

The commission's function in a proceeding of this nature is to determine whether the company is or is not earning a fair return on the reasonable value of its property dedicated to the public service. Under the law, the company is entitled to earnings which will produce such a return. At the same time, the utility company has the legal obligation of furnishing adequate and efficient telephone service to the public at reasonable rates. To make a finding that the company's present rates are unjust and unreasonable to the point of necessitating an increase in rates, the commission must first determine the amount or value of the property of the company which has been dedicated to the public service (the rate base) and then determine the present income being derived from the subscribers to the utility's telephone service (net operating income). Thereafter, if such income does not provide a fair return the commission must determine what would be a fair rate of

return and authorize rates and charges sufficient to produce such a return.

Since there were efforts made at the hearings on this petition to introduce evidence indicating that the company was not providing adequate or efficient service, it is necessary to comment here that the commission is precluded by law from considering adequacy of service in the determination of the just and reasonable rate of return that a telephone utility company may legally demand. For that reason no evidence pertaining to the adequacy of service rendered by this company was admitted in the record and the quality of such service will not be a factor considered by the commission in reaching its decision in this case.

### *Rate Base*

According to the books and records of the company, it computes its rate base as follows —

| | |
|---|---|
| Plant in Service | $3 498 530 |
| Less: Depr. Res. and Amort. Res. | 683 681 |
| Net Plant | $2 814 849 |
| Materials and Supplies | $ 41 580 |
| Cash Working Cap. | 29 510 |
| Net Plant and Working Cap. | $2 885 939 |
| Less: Income Tax Lag | $_____ |
| RATE BASE | $2 885 939 |

The commission's staff has carefully audited the company's records and examined its plant, and finds that the representations here made are reasonable and should be accepted with only two exceptions.

One commission adjustment resulted in increasing the provision for cash working capital by $221. Although the amount involved is of no particular significance, it results from an error in calculation by the company for which it should not be penalized.

The other adjustment considered necessary by the commission results in the reduction of the company's rate base by $48,794. This reduction is occasioned by the failure of the company to provide for an income tax lag. As a usual matter, the income tax lag represents 50% of the annual income tax payment and is justified because the tax is usually paid in quarterly installments and the funds accumulated for such payments represent cash available to the company at least in such percentage. Since this company makes only 2 tax payments annually, one in March and one in

June, we have computed the lag on the basis of an average monthly balance of the actual tax liability and have added to this an adjustment to cover anticipated tax liability under the new rates authorized by this order.

With these two adjustments the commission finds the rate base to be $48,573 less than that computed by the company, or $2,837,-366.

## Net Operating Income

The company's net operating income during the test year amounted to $132,215.26. This amount was realized after operating expenses and taxes had reduced its operating revenue of $708,973.94 by $576,758.68. If the company were to continue to operate at its current rate level, the added cost of operating its improved system would result in a net operating income reduction of $19,250.17. The rates proposed by the company would only increase the net operating income by some $1,650.

The commission has thoroughly investigated the company figures making up the various amounts deducted from gross operating revenues to arrive at the net operating income and is convinced that the figures are correct and that the total amounts have been properly calculated in conformity with approved procedures. Under present rates, the company's net operating income, after proper expense adjustments, would be $112,965.09.

## Rate of Return

The rate of return realized by the company for the year ending June 30, 1961, was approximately 4.49%, but if the company were to continue operating without an increase in rates, the increased cost of owning and operating the recently expanded and improved plant would have reduced this return to 3.91%. The company has proposed a rate of return of 4.64%.

To determine the reasonableness of a rate of return, it is necessary to consider the cost of the capital employed by the company, since the rate of return must be sufficient to allow the company to continue to attract the capital investment necessary for it to operate profitably and to expand and improve its operations as necessary.

Using test year-end figures, the commission finds that 68.14% of the company's capital is represented by loans from the Rural Electrification Administration, while only 31.86% is represented by common equity. The company maintains that it should be allowed revenue which will generate earnings of 10.3% of its com-

mon equity. The cost of the borrowed capital can be covered by a 2% return, because of the low interest government loans.

In view of the equity ratio of 31.86 being rather low for telephone companies, the common equity investment is consequently attended by a higher degree of risk and warrants a higher return. However, since the capital structure of the company ($3,104,361) exceeds its adjusted rate base ($2,837,366), and since the company contends that it needs a 4.64% return on total capital to produce a 10.3% return on common equity and a 2% return on borrowed capital, it is evident that the 4.64% return that the proposed increased rates would produce on the company's rate base would not allow the company the return on common equity that it claims to need. (Apparently, it is purely coincidental that the percentage return on capital and on rate base are the same). Although we think they may be entitled to a 10.3% return on equity capital, the record supports this only as the opinion of management, the same management that knew its proposed rate increase would not produce this amount.

All of which leads to the conclusion that the rate of return of 4.64%, proposed by the company on the rate base claimed by the company, or on the rate base reduced by our adjustment, would produce somewhat less than the company thinks it needs as an adequate return on capital investment. Since the company could have proposed increases high enough to give them the desired return on equity capital and did not do so, management must have concluded, as we do, that other company investments will be expected to make up the deficiency.

The commission, therefore, finds that a rate of return of 4.64% on an adjusted rate base of $2,837,366 is fair and reasonable; that such a return on such a rate base will require annual net operating income in the amount of $131,654; that the company's present net operating income (after pro forma expense adjustments which have been found reasonable) is $112,965, annually; that an annual increase in net operating income of $18,689 is, therefore, required; and that the annual gross revenue increase necessary to produce such a net figure is $39,528.

In consideration of the foregoing, it is ordered that St. Joseph Telephone and Telegraph Company be and it is hereby directed to file with this commission for its approval a schedule of telephone exchange rates and charges which will produce on an annual basis additional gross operating revenues in the amount of $39,528.

It is further ordered that upon approval of such a schedule of telephone rates and charges they shall become effective as of the first day of the first billing period thereafter.